# United States vs. David Andrew Ogden
## 6:24-cr-282-CEM-LHP

**Katherine Puzone**
Assistant Federal Defender
201 S Orange Avenue, Suite 300
Orlando, Florida 32801
Telephone: (407) 648-6338

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA ORLANDO DIVISION**


**UNITED STATES OF AMERICA,**

**V**                                   **Case No. 6:24-cr-282-CEM-LHP**

**David Ogden**

                                                              /

## **APPENDICES**

Mr. Ogden's letter to the court…………………...……..……………..…............A

**Character letters**
Lauren Carter (Mother)……………………………………………..………B1
Henry Frank Carter (Step Father)………………………….……………….B2
Jason Gale (Client)……………………….………………………………….B3
Jack Stultz, LMFT (Therapist)……………………….………...……………B4
*The ITM Group*

**Educational Achievements**
Valencia College………………………………………………………………C1
Seminole State College………………………………………………………C2
University of Central Florida…………………………………………………C3
Educational Assistance report…………………………………..……………C4
MRT Thinking for Good Certificate…………………………………………C5
MRT Coping with Anger………………………………………………………C6

**11th Circuit Unpublished Opinion**
United States Court of Appeals………………………………………………D
*USA Vs Refael Antonio Bracero-Navas*

**Article: NPR**
When a prison sentence becomes a death sentence……………………………E

**A**

Judge Mendoza

I pray this letter reaches you well. I pray Gods hand is in everything you do. I know my case is just one of many responsibilities you have, so thank you in advance for taking the time to read my letter.

What I did was unexceptable and vial, and I take full responsiblity for my discusting sins against God, my family, and my friends. There is no doubt that I must live the rest of my life in utter shame for my repuslive crimes against my nieces and neighbors. As a father of 2 beautiful children I should have known better, I did know better. I chose to compromise my integrity and ignore good judgment. A choice that has cost me my family and reputation. Judge Mendoza, when I think of my revolting act I become so enraged with hatrid twords myself which makes me sick to my stomach. So much so that I have wanted to take my own life many times since commiting these vial sins. Judge Mendoza, I have failed missrably as a decent human being. But I no longer have feelings of self harm I know this is not the end. I know now that self harm is a selfish act just as the dispicable act that got me here.

I can no longer compromise my character or my life. Judge Mendoza I have made a commitment to God myself, my family, and my community to be the best version of myself, to be a diciplined man who is above reproach in the remaining years of my life, and I intend to see my commitment through no matter the outcome of my sentence.

I have also answered Gods calling for me to give support, guidence, & accountability to others who want to be better men.

I have already begun doing this in my pod by teaching daily fitness, nutrition, mindset & stress classes. I also lead a oddly bible study about becoming a strong, honorable, diciplined, christian man called The Measure of a Man by Gene Getz. I have already seen so much positivity com from my students and most notably in myself.

Judge Mendoza, I will never be able to remove the guilt nore shame that I must live with forever. I have caused so much pain & grief for my family & my neighbors. I can never go back and make a better choice. I pray in tears every morning and night for forgiveness for the pain & suffring I have caused, words can never express how truly sorry I am for what I did. I dont know if I will ever be able to truly express how sorry, and discusted I feel for failing my family, my neighbors and myself. Judge Mendoza I am sorry for what I have done & I sware to commit the rest of my life making up for my failure and making a positive contrabution to sociaty by serving others any way I can.

Judge Mendoza, I take full responsability for my � ▇▇▇ ▇▇ despicable actions. I pray daily for those I hurt, my nieces, my neighbors, my family & friends. I pray they are kept safe & that God protects & guides them.

— David "Andrew" Ogden

**B1**

October 30, 2025

The Honorable Judge Mendoza

My name is Lauren Carter, and I am the mother of David "Andrew" Ogden. I am writing this letter to share my perspective of his character and the person I know him to be.

First of all, I want to make it clear that this is not how Andrew was raised. He was brought up to know right from wrong, and to take responsibility for his actions. When I first learned of what happened, I was completely devastated. I could not imagine that being true or really happening. This situation has deeply affected our entire family.

I have always expected better from him because I know the values that were instilled in him — honesty, respect, integrity, and accountability. Seeing him make choices that went against those values was heartbreaking. But over time, I have seen tremendous growth, acceptance, and maturity. He has learned to face his mistakes, to take ownership, and to rebuild his sense of purpose.

While incarcerated, Andrew has made significant efforts to better himself. He now channels his energy through Bible study, exercise, and helping others around him. He has shown himself to be a positive influence on those around him, bringing out the best in others and encouraging them to make better choices as well. He is making a difference — a positive difference. These outlets have strengthened his faith, improved his discipline, and given him a renewed sense of direction.

I know that Andrew is not defined by his past mistakes but by how he learns and grows from them. I believe he now has the insight, humility, and faith to continue moving in a positive direction. I love my son deeply, and while I hold him accountable, I also have faith in the man he is becoming.

Thank you for taking the time to read this letter and for considering my perspective as his mother. I pray that mercy, fairness, and understanding will be shown as he continues on his journey of growth and redemption.

Sincerely,

Lauren Carter

**B2**

October 30, 2025

The Honorable Judge Mendoza

My name is Henry Franklin Carter, and I am writing this statement in unwavering support of my stepson, David Andrew Ogden, whom I have known as Andrew. I have known Andrew for over 16 years. I offer my testimony regarding his character, the challenges he has faced, and our family's absolute commitment to his successful rehabilitation and future.

I am a retired **United States Marine** and a **retired Law Enforcement Officer**, having served the public for over 25 years in Central Florida. My career gave me an intimate understanding of right and wrong, the demands of public service, and the true meaning of integrity. I served with the Apopka Police Department and the Orange County Sheriff's Office, holding varied roles that exposed me to the full spectrum of community issues, including Patrol, Detective, Special Agent with the Metropolitan Bureau of Investigation (MBI) focusing on Organized Crime and VICE, School Resource Officer, and a 9th Circuit Court Deputy.

I met Andrew in 2009 while dating his mother, and his mother and I married in 2014. From the moment he entered my life, he exhibited the same qualities of commitment and dedication that I valued in my own career. I genuinely consider him to be the **"son I never had."**

Andrew's inherent drive for service was demonstrated when he enlisted in the Navy in 2011 with the ultimate goal of joining the elite **Navy SEAL Program**. This choice speaks volumes about his character—he sought out the most challenging path possible.

He successfully completed boot camp in Great Lakes and progressed to Pre-BUD/S training in Coronado, California. This phase of his life ended in heartbreaking tragedy: while undergoing rigorous training, he suffered a **stroke**. Classmates confirmed that he became severely disoriented, exhibiting slurred and incoherent speech. The subsequent medical diagnosis confirmed a serious, underlying heart condition.

Despite his medical setback, Andrew remained in training, utilizing his EMT background in the medical section, in the hope of continuing his service. He was eventually **medically discharged** from the Navy due to his condition. He was profoundly disappointed that he was unable to complete his dream of becoming a SEAL and remaining in the service. The crushing blow of the medical discharge from the Navy was a deep, personal trauma for Andrew. He had dedicated himself entirely to a singular goal, only to have it stripped away by an unavoidable medical condition. This event was an emotional devastation that, I believe, planted the seed for later challenges.

Upon his return home, he immediately transitioned that drive into a new professional pursuit. He earned his Bachelor's degree in Physical Therapy, intending to work toward a Master's degree in Sports Medicine. This pivot demonstrates his resilience and his commitment to a productive civilian life.

When I was first informed of the charges against Andrew, I was in absolute shock and disbelief. The actions described are fundamentally inconsistent with the devoted son, determined serviceman, and loving father I have known for over sixteen years.

I believe that the emotional fallout from the loss of his military career and his medical condition, combined with other life stressors, has led to a desperate need for professional intervention. **Andrew needs immediate and structured counseling.**

I sincerely believe that the man I know—the one who strove to be a SEAL and the one who was a devoted father—is still within him. Given the structure, professional counseling, and family support, **Andrew will be capable of overcoming his issues.**

Henry F. Carter

**B3**

**1 Nov 2025**

**The Honorable Carlos E. Mendoza**
 United States District Court
 401 W. Central Ave, Courtroom 5B
 Orlando, FL

**Re: Character letter for Mr. David Ogden**

Dear Judge Mendoza,

My name is Jason C. Gale, and I am writing on behalf of Mr. David Ogden, whom I have known personally for nearly 5 years as my fitness and nutrition coach and as a friend. For a time, we also collaborated and worked together on being a nutrition coach to other men. I currently work as an electrical engineer and reside in Albuquerque, New Mexico.

I met Mr. Ogden when I sought help improving my health. Under his coaching, I lost over 20 pounds and, more importantly, built sustainable habits around nutrition, exercise, and accountability. Throughout our work together, David was consistently considerate, helpful, supportive, and professional. He checked in regularly, adjusted plans when life got complicated, and celebrated small wins with genuine encouragement.

My experience is not unique. I am aware of several others he has trained who share similar stories of improved health and confidence. In every interaction I have had or observed, David has been patient, respectful, and sincerely invested in the well-being of the people he serves. He is the kind of coach who remembers details about family and work schedules and tailors support so clients can succeed without feeling judged or discouraged.

Beyond fitness, David has also shown a deep commitment to helping others grow spiritually and morally. He leads a men's group focused on the book *The Measure of a Man*, where participants meet weekly to study its principles and discuss how to become better husbands, fathers, and community members. Through this effort, he has helped many people, including myself, reflect on personal growth, accountability, and living with integrity.

He is a person that I deeply respect and admire. I cannot emphasize strongly enough how much he has helped me in my life, and I am profoundly thankful for his presence and influence. I am fully aware of what he has done and how serious and awful it is. Even so, I believe he is much more than that single chapter of his life. I have seen the good in him—the part that teaches, uplifts, and genuinely strives to make others better—and I know that good still exists in him.

While I understand that David will be incarcerated and in a different state, I remain committed to supporting his continued progress from afar. I am willing to serve as an accountability partner by offering emotional support and faith-based guidance, engaging in discussions about spirituality, personal responsibility, and how to become a better man. I believe his ability to encourage

others and his willingness to work on himself demonstrate a genuine desire to change and
contribute positively to society.

Thank you for taking the time to read my letter and consider my perspective.

Respectfully,

## Jack "Benji" Stultz, LMFT
Therapist - The ITM Group
1208 NW 6th Street, Gainesville, Florida 32601

October 3, 2025



Re: David Andrew Ogden

This is a letter regarding the treatment progress thus far for Mr. David Andrew Ogden, who was referred and began outpatient individual treatment while in custody at the Seminole County Jail. Thus far Mr. Ogden has been seen for eight sixty minute individual sessions, completed on 5/2/25, 5/13/25, 6/13/25, 7/18/25, 8/1/25, 8/22/25, 9/12/25, and 10/3/2025.

Mr. Ogden has been actively participating in each session, answers questions openly and processing concepts as part of looking at his problem behavior, issues leading up to the problem behavior, and processing his current status awaiting final judicial sentencing. Some issues discussed as a part of sessions included looking at his history of relationships, mental health history, and sexual history. He discussed issues in having past romantic relationships that lacked emotional intimacy with the partner, and reflecting on how many of these partners he would start any romantic relationship because of interest on their part, but he would not consider if the person would show him the emotional intimacy he wanted. He says he would then stay in the relationship even if it was not healthy, and wait until the other partner would end it. He says most of these partners occurred in the years between high school and his enlistment in the Navy. Mr. Ogden reports some mental health counseling following a Baker Act at age 19 after his then girlfriend cheated on him. He was placed on several medications at that time he used briefly. He began having panic attacks in 2013 following his discharge from the Navy, which he was unsure if this had to do with his then romantic relationship, or due to factors from the stroke he had while in Navy Seals training leading to his honorable medical discharge.

Mr. Ogden admits to heavy use of pornography beginning as a teen and continuing as an adult. He says use would go up and down as an adult, depending on if he was in a relationship. He says use was limited at the beginning of his relationship with his future wife. However, he admits use began to increase over time in the marriage. He also reports his use of alcohol began to increase during the course of his marriage.

At the present time Mr. Ogden reports focusing on sharing his knowledge as a fitness coach to other inmates in his pod who are interested in learning about better health. Mr. Ogden has talked about his knowledge of exercise and proper nutrition for feeling better physically and mentally. He has shared how helpful his knowledge and training has been for others in his pod, either with eating better to feel better, and also use of exercise. He also reports how he has been leading a study of a book on being a better Christian man with the others in the pod, both for his own benefit, and the benefit of the others.

He admits that in the time leading up to his offense, he was not following his guidelines, especially in his use of alcohol to self-medicate his feelings of emotional loneliness in his marriage, and he regrets not using his own prescriptions of actions for himself that he would instill in his clients.  That said, he has stated multiple times he does not blame his alcohol use, pornography use, or offense on his wife and their relationship problems, saying that he is ultimately responsible for his choices in utilizing poor coping skills at that time.  He has said repeatedly how he feels a deep sense of remorse for how his actions have affected so many people.  He has also processed his thoughts and feelings about being away from his wife and two children, as he says he was heavily involved in the care-taking of his two children while his wife was in college and then began her medical career.

In discussing his history and issues leading up to his offense, Mr. Ogden was very amenable to challenging some of the beliefs he had before his arrest.  Overall when discussing aspects of issues and past problematic decisions, Mr. Ogden was greatly remorseful for his actions and the effects of harm for all affected by any problematic behaviors.

Overall Mr. Ogden appears to continue benefiting from attending outpatient treatment and appears very amendable to addressing his issues as a part of a counseling program.  Once sentenced, he appears to be a very good candidate to do well in problem sexual behavior specific counseling, to be completed with a therapist who specializes in sex offender-specific treatment following the guidelines set forth by ATSA (Association for the Treatment of Sexual Abusers).

If you have any further questions or concerns, please contact me either by cell phone at ███ ████ or by email at benji@itmflorida.com.

Sincerely,

*Jack B Stultz, LMFT*

Jack B. Stultz, M.S., LMFT
Licensed Marriage & Family Therapist #MT2147

OFFICIAL ACADEMIC DOCUMENT

# VALENCIA COLLEGE

P.O. Box 3028
Orlando, FL 32802

**C1**

**Student Name:** David A Ogden

**Issued To:**

David Ogden

Date Issued: 01-OCT-2018          Page: 1

| Residency For Fees: | **Florida Resident** | | |
|---|---|---|---|
| **PERT** | 10/09/13 | 10/09/13 | 10/09/13 |
| | PRTM 106 | PRTR 109 | PRTW 108 |

## PERMANENT ACADEMIC RECORD

| PREFIX | NO. | COURSE TITLE | CRED | GRD | QUAL. PTS | TYPE |
|---|---|---|---|---|---|---|

Current Program
   Program : Transient
   Major : Undeclared

   Events: Gen Education Requirements Met

Degrees Awarded Associate in Arts Degree 20-DEC-2015
Primary Degree
   Program : Associate in Arts

TRANSFER CREDIT ACCEPTED BY THE INSTITUTION:

TRANSFER          Seminole State Coll of Florida

| EMS | 1119 | Fund Emergency Med Tech | 3.00 | A | | |
| EMS | 1119L | Fund of EMT Practice | 4.00 | A | | |
| EMS | 1431 | Emergency Med Tech Clin Prac | 4.00 | A | | |
| REA | 0002 | CQL PREP READ II | 4.00 | W | | |
| SPC | 1608 | Fundamentals of Speech | 3.00 | C | | |

Ehrs: 14.00 GPA-Hrs: 14.00 QPts: 50.00 GPA: 3.57

INSTITUTION CREDIT:

Spring 2014 Credit Courses
| ENC | 1101 | Freshman Comp I | 3.00 | A | 12.00 | I |
| MAT | 0028C | Developmental Math II | 3.00 | A | 12.00 | |

Ehrs: 6.00 GPA-Hrs: 6.00 QPts: 24.00 GPA: 4.00
President's List

Summer 2014 Credit Courses
| ENC | 1102 | Freshman Comp II | 3.00 | B | 9.00 | I |
| MAT | 1033C | Intermediate Algebra | 3.00 | B | 9.00 | I |

Ehrs: 6.00 GPA-Hrs: 6.00 QPts: 18.00 GPA: 3.00

Fall 2014 Credit Courses
| ASL | 2140 | American Sign Language I | 4.00 | B | 12.00 | I |
| HUM | 2250 | Humanities 20th Century | 3.00 | B | 9.00 | I |

***************** CONTINUED ON NEXT COLUMN ******************

Institution Information continued:
| MAC | 1105 | College Algebra | 3.00 | B | 9.00 | I |

Ehrs: 10.00 GPA-Hrs: 10.00 QPts: 30.00 GPA: 3.00

Spring 2015 Credit Courses
| ASL | 2150 | American Sign Language II | 4.00 | A | 16.00 | I |
| HUM | 2223 | Hum Late Roman And Medieval | 3.00 | A | 12.00 | I |
| POS | 2041 | U.S. Government | 3.00 | A | 12.00 | I |
| STA | 2023 | Statistical Methods | 3.00 | B | 9.00 | I |

Ehrs: 13.00 GPA-Hrs: 13.00 QPts: 49.00 GPA: 3.76
President's List

Summer 2015 Credit Courses
| BSC | 1010C | Fundamentals Of Biology I Comb | 4.00 | B | 12.00 | I |
| MAC | 1114 | College Trigonometry | 3.00 | A | 12.00 | I |

Ehrs: 7.00 GPA-Hrs: 7.00 QPts: 24.00 GPA: 3.42

Fall 2015 Credit Courses
| HUM | 1020 | Intro To Humanities | 3.00 | A | 12.00 | I |
| PHY | 2053C | College Physics I with Algebra | 4.00 | B | 12.00 | I |
| PSY | 2012 | General Psychology | 3.00 | A | 12.00 | I |

Ehrs: 10.00 GPA-Hrs: 10.00 QPts: 36.00 GPA: 3.60
Dean's List

Spring 2016 Credit Courses
| PHY | 2054C | College Physics II with Algebr | 4.00 | B | 12.00 | |

Ehrs: 4.00 GPA-Hrs: 4.00 QPts: 12.00 GPA: 3.00

******************** TRANSCRIPT TOTALS *********************

| | Earned Hrs | GPA Hrs | Points | GPA |
|---|---|---|---|---|
| TOTAL INSTITUTION | 56.00 | 56.00 | 193.00 | 3.44 |
| TOTAL TRANSFER | 14.00 | 14.00 | 50.00 | 3.57 |
| OVERALL | 70.00 | 70.00 | 243.00 | 3.47 |

******************** END OF TRANSCRIPT *********************

_signature_

Assistant Vice President of
Admissions and Records

**"RECORD IS NOT TO BE RELEASED TO A THIRD PARTY WITHOUT PERMISSION FROM THE STUDENT."**

A PHOTOCOPY OF THIS DOCUMENT IS NOT OFFICIAL

COPY APPEARS ACROSS THE FACE OF ENTIRE DOCUMENT WHEN PHOTOCOPIED · LIQUID BLEACH TURNS OFFICIAL PAPER BROWN



**C2**

**SEMINOLE STATE COLLEGE** OF FLORIDA

Print Date  : 2018-11-15
Page No. 1

Seminole State College Official Transcript

Seminole State College of Florida
100 Weldon Boulevard
Sanford, FL 327736199
United States
Identifying Code: 001520

Name  : David Ogden

Send To  : DAVID OGDEN

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| EMS | 1119 | Emergency Medi Tech | 3.00 | 3.00 | A | 12.000 |
| EMS | 1119L | EMT Laboratory | 4.00 | 4.00 | A | 16.000 |
| EMS | 1431 | EMT Clinical | 4.00 | 4.00 | A | 16.000 |

TERM GPA : 4.000     TERM TOTALS : 11.00   11.00        44.000

SSC GPA : 3.571     SSC TOTALS : 14.00   14.00        50.000
CUM GPA : 3.571     CUM TOTALS : 14.00   14.00        50.000

**Sum 2008  (2008-05-05 to 2008-07-31)**

- - - - Test Results  - - - -

| | | | | |
|---|---|---|---|---|
| CPT | CLM | Elementary Algebra | 2006-04-26 | 17.00 |
| CPT | | Elementary Algebra | 2006-04-26 | 78.00 |
| CPT | | Reading | 2006-04-26 | 60.00 |
| CPT | | Sentence Skill | 2006-04-26 | 92.00 |

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| REA | 0002C | College Prep Reading Sk II | 4.00 | 0.00 | W4 | |

TERM GPA : 0.000     TERM TOTALS : 4.00    0.00        0.000

- - - - Academic Program History - - - -

Program  : Credit Cert / Applied Tech Dip
2007-12-11 : Completed Program
   Fall 2007 - Emergency Med Tech - Basic

SSC GPA : 3.571     SSC TOTALS : 18.00   14.00        50.000
CUM GPA : 3.571     CUM TOTALS : 18.00   14.00        50.000

**Credit Career Totals**

- - - - External Degrees - - - -

The Master's Academy
 2005-05-27 High School Diploma

SSC GPA : 3.571     SSC TOTALS : 18.00   14.00        50.000
TRFR GPA : 0.000     TRFR TOTALS : 0.00    0.00        0.000
CUM GPA : 3.571     CUM TOTALS : 18.00   14.00        50.000

- - - - Beginning of Credit Career Record - - - -

- - - - Degrees Awarded - - - -

**Sum 2006  (2006-05-08 to 2006-08-03)**

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| SPC | 1600 | Intro Oral Communication | 3.00 | 3.00 | C | 6.000 |

Degree  : Technical Certificate
Confer Date  : 2007-12-11
Degree GPA  : 3.571
Degree Honors : Graduation with High Honors
Plan  : Emergency Medical Technician - Basic (EMT-B)

TERM GPA : 2.000     TERM TOTALS : 3.00    3.00        6.000

SSC GPA : 2.000     SSC TOTALS : 3.00    3.00        6.000
CUM GPA : 2.000     CUM TOTALS : 3.00    3.00        6.000

**Fall 2007  (2007-08-22 to 2007-12-11)**

End Of Transcript

**TO VERIFY: TRANSLUCENT GLOBE ICONS MUST BE VISIBLE WHEN HELD TOWARD A LIGHT SOURCE**     **AN OFFICIAL SIGNATURE IS WHITE WITH A BLUE BACKGROUND**

This officially sealed and signed transcript is printed on blue SCRIP-SAFE® security paper with the name of the institution printed in white type across the face of the document. When photocopied the word COPY and the name of the College should appear. A raised seal is not required. A BLACK ON WHITE OR A COLOR COPY SHOULD NOT BE ACCEPTED.


Pamela Mennecher
Associate Vice President, Admissions and Enrollment Services

In accordance with the Family Educational Rights and Privacy Act of 1974, this information can not be released to any party without the student's written consent.

SLATE

Date Printed: 12/03/2018

Name     : Ogden,David Andrew

6F

RECEIVED DEC 03 2018

6600 = 3.3

University of Central Florida
OFFICIAL
College of Graduate Studies

- - - - - Academic Program

Major          College of Health & Public Aff
               Health Sciences - Pre Clinical Allied Health

- - - - - UCF Degrees Awarded

Degree         Bachelor of Science
Confer Date    05/03/2018
Major          Health Sciences - Pre Clinical Allied Health

General Education Requirements Met

- - - - - Transfer Credits

Seminole State College of FL       FICE: 001520

| Course | Title | Earned | Grde | Typ | Points |
|--------|-------|--------|------|-----|--------|

**2006 Summer Semester**

| SPC 1800 | FND SPEECH | 3.00 | C | | 6.00 |

**2007 Fall Semester**

| EMS 1119 | EMERGENCY MEDI TECH | 3.00 | A | | 12.00 |
| EMS 1119L | EMT LABORATORY | 4.00 | A | | 16.00 |
| EMS 1431 | EMT CLINICAL | 4.00 | A | | 16.00 |

**2008 Summer Semester**

| REA 0002C | CL PREP RD SK II | | W | | |

| School Totals | | Attempt | Earned | Points | GPA |
|---------------|--|---------|--------|--------|-----|
| | | 14.00 | 14.00 | 50.00 | 3.571 |

Valencia College      FICE: 006750

| Course | Title | Earned | Grde | Typ | Points |
|--------|-------|--------|------|-----|--------|

**2014 Spring Semester**

| MAT 0028C | DEVELOPMENTAL MATH II | | A | | |
| ENC 1101 | FRESHMAN COMP I | 3.00 | A | | 12.00 |

**2014 Summer Semester**

| MAT 1033C | INTERMED ALGEBRA | 3.00 | B | | 9.00 |
| ENC 1102 | COMP II | 3.00 | B | | 9.00 |

**2014 Fall Semester**

| MAC 1105 | COLLEGE ALGEBRA | 3.00 | B | | 9.00 |
| ASL 2140 | AMERICAN SIGN LANGUAGE I | 4.00 | B | | 12.00 |
| HUM 2250 | HMN 20TH CENTURY | 3.00 | B | | 9.00 |

**2015 Spring Semester**

| POS 2041 | U.S. GOVERNMENT | 3.00 | A | | 12.00 |
| ASL 2150 | AMERICAN SIGN LANGUAGE II | 4.00 | A | | 16.00 |
| STA 2023 | INTR SOCIAL STATS | 3.00 | B | | 9.00 |
| HUM 2223 | HUM LATE ROMAN AND MEDIEVAL | 3.00 | A | | 12.00 |

**2015 Summer Semester**

| MAC 1114 | COLL TRIG | 3.00 | A | | 12.00 |
| BSC 1010C | FUNDAMENTALS OF BIOLOGY I | 4.00 | B | | 12.00 |

**2015 Fall Semester**

| HUM 1020 | INTRO TO HUMANITIES | 3.00 | A | | 12.00 |
| PSY 2012 | GENERAL PSYCHOLOGY | 3.00 | A | | 12.00 |
| PHY 2053C | COLL PHYS I W/L | 4.00 | B | | 12.00 |

**2016 Spring Semester**

| PHY 2054C | COLLEGE PHYSICS II WITH ALGEBR | 4.00 | C | | 8.00 |

| School Totals | | Attempt | Earned | Points | GPA |
|---------------|--|---------|--------|--------|-----|
| | | 53.00 | 53.00 | 177.00 | 3.340 |

| Overall Transfer Course Totals | Attempt | Earned | Points | GPA |
|--------------------------------|---------|--------|--------|-----|
| | 67.00 | 67.00 | 227.00 | 3.388 |

- - - - External Degrees

Valencia College  FICE: 006750
12/20/2015  Associate in Arts Degree

- - - - - Beginning of UCF Undergraduate Record

| Course | Title | Atmp | Earne | Grde | Typ | Points |
|--------|-------|------|-------|------|-----|--------|

**Spring 2016  (01/11/2016 to 05/04/2016)**

| HSC 3110 | MEDICAL SELF ASSESSMENT | 3.00 | 3.00 | A | | 12.000 |
| HSC 3147 | INTRODUCTION TO PHARMACOLOGY | 3.00 | 3.00 | A | | 12.000 |
| HUN 2201 | DEVELOPMENTAL HUMAN NUTRITION | 3.00 | 3.00 | A | | 12.000 |

| | | Attempt | Earned | Points | GPA |
|--|--|---------|--------|--------|-----|
| Totals for GPA | | | | | |
| Term / UCF Cumulative | | 9.00 | 9.00 | 36.00 | 4.000 |

**Summer 2016  (05/16/2016 to 08/05/2016)**

| CHM 2045C | CHEMISTRY FUNDAMENTALS I | 4.00 | 4.00 | B | | 12.000 |
| HSA 4702 | HEALTH SCI RESEARCH METHODS | 3.00 | 3.00 | A | | 12.000 |
| HSC 4558 | PROF DEVELOPMENT IN HP | 3.00 | 3.00 | A | | 12.000 |

| | | Attempt | Earned | Points | GPA |
|--|--|---------|--------|--------|-----|
| Totals for GPA | | | | | |
| Term | | 10.00 | 10.00 | 36.00 | 3.600 |
| UCF Cumulative for GPA | | 19.00 | 19.00 | 72.00 | 3.789 |

**Fall 2016  (08/22/2016 to 12/12/2016)**          S7

| CHM 2046 | CHEMISTRY FUNDAMENTALS II | 3.00 | 3.00 | C | | 6.000 |
| CHM 2046L | CHEMISTRY FUNDAMENTALS LAB | 1.00 | 1.00 | A | | 4.000 |
| DEP 2004 | DEVELOPMENTAL PSYCHOLOGY | 3.00 | 3.00 | A | | 12.000 |
| ZOO 3733C | HUMAN ANATOMY | 4.00 | 4.00 | B | | 12.000 |

| | | Attempt | Earned | Points | GPA |
|--|--|---------|--------|--------|-----|
| Totals for GPA | | | | | |
| Term | | 11.00 | 11.00 | 34.00 | 3.091 |
| UCF Cumulative for GPA | | 30.00 | 30.00 | 106.00 | 3.533 |

**Spring 2017  (01/09/2017 to 05/02/2017)**        45

| ATR 3203C | UPPER EXTREMITY FUNCTION | 3.00 | 3.00 | A | | 12.000 |
| ATR 3204C | LOWER EXTREMITY FUNCTION | 3.00 | 3.00 | A | | 12.000 |
| PCB 3703C | HUMAN PHYSIOLOGY | 4.00 | 4.00 | B | | 12.000 |

| | | Attempt | Earned | Points | GPA |
|--|--|---------|--------|--------|-----|
| Totals for GPA | | | | | |
| Term | | 10.00 | 10.00 | 36.00 | 3.600 |
| UCF Cumulative for GPA | | 40.00 | 40.00 | 142.00 | 3.550 |

**Summer 2017  (05/15/2017 to 08/04/2017)**      28 35

| HSA 3111 | U.S. HEALTH CARE SYSTEMS | 3.00 | 3.00 | A | | 12.000 |
| HSC 3211 | PREVENTIVE HEALTH CARE | 3.00 | 3.00 | B | | 9.000 |
| HSC 4652 | HEALTH LAW AND ETHICS | 3.00 | 3.00 | A | | 12.000 |
| HSC 4501 | EPIDEMIOLOGY CHRONIC DISEASES | 3.00 | 3.00 | C | | 6.000 |

| | | Attempt | Earned | Points | GPA |
|--|--|---------|--------|--------|-----|
| Totals for GPA | | | | | |
| Term | | 12.00 | 12.00 | 39.00 | 3.250 |
| UCF Cumulative for GPA | | 52.00 | 52.00 | 181.00 | 3.481 |

**Fall 2017  (08/21/2017 to 12/09/2017)**          23

| BSC 2011C | BIOLOGY II | 4.00 | 4.00 | B | | 11.000 |
| HSC 3537 | MEDICAL TERMINOLOGY | 3.00 | 3.00 | A | | 12.000 |
| HSC 4555 | PATHOPHYSIOLOGY I | 3.00 | 3.00 | B+ | | 9.750 |

Date Printed: 12/03/2018

Name    : Ogden,David Andrew

████████████████████

| Course | Title | Atmp | Earne | Grde | Typ | Points |
|--------|-------|------|-------|------|-----|--------|
| **Fall 2017** | **(08/21/2017 to 12/09/2017)** | (cont) | | | | |
| HSC 4572 | CLINICAL NUTRITION | 3.00 | 3.00 | A | | 12.000 |

| Totals for GPA | | Attempt | Earned | Points | GPA |
|----------------|--|---------|--------|--------|-----|
| Term | | 13.00 | 13.00 | 44.75 | 3.442 |
| UCF Cumulative for GPA | | 65.00 | 65.00 | 225.75 | 3.473 |

Term Honors: Dean's List

**Spring 2018   (01/08/2018 to 05/01/2018)**

| Course | Title | Atmp | Earne | Grde | Typ | Points |
|--------|-------|------|-------|------|-----|--------|
| ATR 3312C | INJURY MANAGEMENT & REHAB | 3.00 | 3.00 | B+ | | 9.750 |
| HSC 4558 | PATHOPHYSIOLOGY II | 3.00 | 3.00 | A | | 12.000 |
| PCB 3233L | IMMUNOLOGY LABORATORY | 1.00 | 1.00 | B | | 3.000 |
| PET 4312C | APPLIED BIOMECHANICS | 3.00 | 3.00 | A | | 12.000 |

| Totals for GPA | | Attempt | Earned | Points | GPA |
|----------------|--|---------|--------|--------|-----|
| Term | | 10.00 | 10.00 | 36.75 | 3.675 |
| UCF Cumulative for GPA | | 75.00 | 75.00 | 262.50 | 3.500 |
| | | | | | |
| Transfer Credits for GPA | | 67.00 | 67.00 | 227.00 | 3.388 |
| | | | | | |
| Overall for GPA | | 142.00 | 142.00 | 489.50 | 3.447 |

\* Total Credit Accepted Including Not for GPA :    142.00

- - - - - End of UCF Undergraduate Record

- - - - - END OF TRANSCRIPT

**SENT ON FRIDAY, AUGUST 25, 2017 AT 11:49 AM**

From: **sas@ucf.edu**

Subject: **HSC 3537.0W65 - MEDICAL TERMINODGY (CRN: 87302) - Course Accessibility Letter - For Your Information - Fall 2017**

This email was copied to:

amanda.walden@ucf.edu

olga.russell@ucf.edu

 **UNIVERSITY OF CENTRAL FLORIDA**

**Student Accessibility Services**
Course Accessibility Letter

Friday, August 25, 2017

**Fall 2017 - HSC 3537.0W65 - MEDICAL TERMINOLOGY (CRN: 87302)**
Professor: Ms Amanda Walden, Ms Olga Russell
Enrolled Student: David Ogden (1567079)

Dear Professor,

UCF is committed to access for students with disabilities. Student Accessibility Services (SAS) is a resource to fulfill this commitment. By partnering with you, we ensure students experience access in their coursework through accommodations or other outcomes.

The accommodations listed below are a starting point for access and are not intended to be an exhaustive list of options. Alternative paths to access are possible. Upon student request or SAS notification (such as a test request), please facilitate the following accommodations or contact SAS if you have questions about reasonableness relative to your course. **It is expected that you speak with SAS before declining any accommodations so all access angles can be considered and different options for access can be explored where feasible.**

**FIRST STEP:**

As needed*, submit the Test Contract: https://olympic.accessiblelearning.com/UCF/ContractInstructor.aspx?ID=32478&CID=134234&Key=OlDWUo7v

The Test Contract provides SAS with the proctoring information. (NEW AS OF SPRING 2016.)

SAS proctors quizzes, exams and final exams for students who submit exam requests. SAS does not need the exam until closer to the exam date. More instructions will be available when you follow the secure link.

*If you do not have any exams in your class or your exam does not require SAS assistance (i.e. at home exams, etc.), please do not fill out this Test Agreement. If your exams are administered via Webcourses and students are not required to take the exam in a proctored environment, you do not need to submit this agreement.

1. **Alternative Formats**

   ***E-Text***
   Textbooks may be provided in Electronic Text or Large Print

2. **Alternative Testing**

   ***Distraction-Reduced Environment***
   Tests and quizzes to be proctored in a distraction-reduced environment

   ***Extra Time 2.00x***
   2x of class exam time (double time) for tests/quizzes

   **Students must confirm the need to use extended time for online exams with their professor at least two business days prior to the exam.** The Center for Distributed Learning provides instructions on how to extend time for quizzes in Webcourses@UCF. Please visit the following CDL website to learn how to extend time on multiple quizzes for multiple students at once: https://online.ucf.edu/support/webcourses/integrations/quiz-extensions/

   ***Speech to Text Software (i.e. Dragon)***
   Speech to Text Software may be used for tests/quizzes or other class activities

Accommodations are not retro-active. The student needs to inform you and/or SAS of the intention to use specific accommodations prior to the course event and with a reasonable amount of time for adequate facilitation.

Reasonable accommodations are determined on a case-by-case basis based upon the design of the course and the student's situation. At the time this letter is sent, SAS has knowledge of the student but likely has no knowledge of your specific course design. As a result, some accommodations listed within this letter may not align with course activities or may fundamentally alter the course objectives. If you believe that is the case, please contact SAS to discuss further.

**Reasonable accommodation and modification possibilities can extend beyond what is listed in this letter so long as they do not fundamentally alter the essential course objectives.** If you have other ideas regarding how to create access for your course beyond what is listed, SAS encourages you to speak with the student or SAS to explore alternative options. Your input is a valuable part of the process.

For more information on the listed accommodations, go to: http://sas.sdes.ucf.edu/accommodations

If you would like to easily view all course accessibility letters for all students connected with SAS in your courses, upload tests or provide testing proctor information all in o place, check out the Knights Access Instructor Portal: http://sas.sdes.ucf.edu/facultyguides

Thank you for contributing to an accessible education experience!

Sincerely,

**Student Accessibility Services**
University of Central Florida
4000 Central Florida Blvd.
Ferrell Commons 7F Room 185
Orlando, FL 32816-0161
Phone: 407-823-2371
Fax: 407-823-2372
Email: SAS@ucf.edu

Email reference code: 1

## APPOINTMENTS

Number of Appointments: **1**

**APPLICATIONS: TUESDAY, JUNE 07, 2016 AT 10:30 AM**

*Current Data*

| Updated On | Updated By | Changes |
|---|---|---|
| June 07, 2016 11:42 AM | Theda Llewellyn | <ul><li>Status: **Meeting Completed**</li><li>Term: **Summer 2016**</li><li>Date: **06/07/2016**</li><li>Time: **10:30 AM**</li><li>Length: **1 Hr**</li><li>Meeting With: **Theda Llewellyn**</li><li>Staff Note:</li></ul>(student) David met with (AC) Theda for welcome meeting. Student is a Junior and a military veteran. He is already connected to VARC. He received accommodations in high school but never at Valencia or UCF. He suffered a stroke when he was 25 and has since developed a learning disability. He says it is difficult for him to read and comprehend quickly. He runs out of time during tests. Reading or writing assignments are time consuming because it takes him longer to process. He has also requested assistance with notetaking. He cannot keep up with the professor during lectures if they do not provide powerpoints or something to follow along with. He is interested in using Dragon for his tests and personal use at home. Student has requested e-text.<br><br>Student was given a Smart Pen by VARC. He would like to request training on how to use it.<br><br>AC recommended read & write gold as well as Dragon. AC approved testing, e-text and audio recording/word processing for notes. AC will send Sonocent info link.<br><br>tpl<ul><li>Appointment Purposes:<ul><li>**Added**: Welcome Meeting</li></ul></li><li>Deleted: **No**</li></ul> |



# Certificate of Completion

*This Certificate is awarded to:*

## David Andrew Ogden

*For the successful completion of*
*the Orange County Corrections Department's*

### MRT - Thinking for Good

*November 19, 2024*

_____               __11/19/2024_____

C. Gomez, Sr. Community Corrections Officer                     Date

# Orange County Corrections Department
## Community Corrections Division

*Certificate of Completion presented to*

# David Andrew Ogden

*For the successful completion of*

# Moral Reconation Therapy
# Coping with Anger

*This Moral Reconation Therapy curriculum focuses on teaching and practicing anger management skills.*

January 7th, 2025

C. Gomez, Senior Community Corrections Officer



# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 12, 2024

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  22-12887-HH
Case Style:  USA v. Rafael Bracero-Navas
District Court Docket No:  6:21-cr-00113-CEM-LHP-1

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered
today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP
41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing is governed by 11th Cir. R. 40-3, and the time
for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise
provided by FRAP 25(a) for inmate filings, a petition for rehearing is timely only if received in
the clerk's office within the time specified in the rules. **A petition for rehearing <u>must</u> include
a Certificate of Interested Persons and a copy of the opinion sought to be reheard.** <u>See</u> 11th
Cir. R. 35-5(k) and 40-1.

Costs
No costs are taxed.

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the
Court's website at www.ca11.uscourts.gov. For more information regarding costs, <u>see</u> FRAP 39
and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any
objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming
compensation via the eVoucher system no later than 45 days after issuance of the mandate or
the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or

cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion

[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-12887

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

RAFAEL ANTONIO BRACERO-NAVAS,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:21-cr-00113-CEM-LHP-1

————————————————

Before JORDAN, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Rafael Bracero-Navas was found guilty of seven counts of sexual exploitation of a minor and sentenced to 480 months' imprisonment, followed by 15 years' supervised release. He now appeals his conviction and sentence. Bracero-Navas argues that the district court charged the jury with an erroneous definition of "lascivious exhibition," and that it erred by failing to group all his counts into a single group under United States Sentencing Guidelines section 3D1.2(b).

After careful review, we affirm. The district court's "lascivious exhibition" instruction was a correct statement of the law, and the district court did not plainly err by declining to group Bracero-Navas's counts into a single group.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On May 27, 2021, Bracero-Navas's 16-year-old daughter, J.B., reported inappropriate behavior by Bracero-Navas to her school resource officer. Bracero-Navas was arrested, tried by a jury, and convicted of seven counts of sexual exploitation of a minor in violation of 18 U.S.C. sections 2251(a) and (e), for seven photographs of J.B. found on his phone. The photos were pixelated thumbnails that remained on Bracero-Navas's phone after the larger, full-image files were deleted. Each photo was surreptitiously taken from under J.B.'s closed bathroom door, and in many of them J.B. is seen exiting the shower or sitting on the toilet. She

is nude in all of them.  The photo from count one (government exhibit 9.1) shows red or pink joggers in the foreground.  The photo from count three (government exhibit 9.3) shows a black and white clothing article on the bathroom floor.  The other five photos (government exhibits 9.2, 9.4, 9.5, 9.6, and 9.7) do not show articles of clothing.

Before trial, Bracero-Navas and the government proposed jury instructions.  Relevant to this appeal, Bracero-Navas objected to the inclusion of this sentence within the definition of "lascivious exhibition":  "Depictions of otherwise innocent conduct may constitute a lascivious exhibition of the genitals or pubic area of a minor based on the actions of the individual creating the depiction."  The district court held a jury charging conference at which Bracero-Navas again objected to the instruction.  The district court overruled the objection, and included the sentence in the lascivious exhibition instruction.

Bracero-Navas also objected to the presentence investigation report, in which the probation officer grouped counts two and four through seven together in a single group under section 3D1.2(a) because they all involved the same victim and there was no evidence that these counts involved separate acts.  The probation officer found that counts one and three occurred on different occasions because of the articles of clothing depicted, and excluded them from grouping because they could not "be considered as one composite harm" under section 3D1.2.  The adjusted offense level for each of Groups One (which contained count one), Two

(which contained count three), and Three (which contained counts two and four through seven) was 34.  The probation officer made a multiple count adjustment under guidelines section 3D1.4 by increasing the offense level by three units, for a combined adjusted offense level of 37, because there were three total units assigned. Bracero-Navas's guideline range was 360 months to 2520 months pursuant to U.S.S.G. section 5G1.2(b), because the statutorily authorized maximum was less than the guideline imprisonment range of 360 months to life.

Bracero-Navas objected to paragraphs 43 through 68 of the PSI, specifically disagreeing with the guidelines computation and arguing that all seven counts should be grouped into a single group of closely related counts.  He argued that the government had not met its burden of showing even by a preponderance of the evidence "when, where, or even how the images were taken."  The probation officer responded by pointing to section 3D1.2(b), comment n.4, to explain that grouping is not authorized under section 3D1.2(b) for "offenses that cannot be considered to represent essentially one composite harm (e.g., robbery of the same victim on different occasions involves multiple, separate instances of fear and risk of harm, not one composite harm)."

The district court gave Bracero-Navas an opportunity to clarify his objections for the record at the sentencing hearing.  Bracero-Navas again objected to paragraphs 43 through 68, arguing that "there's no metadata telling us when the pictures were taken, how they were taken," and that they "could all be from a single film, a

single video." He again asserted that the government had not met its burden. In response, the government pointed to the pink joggers in the foreground of exhibit 9.1, and the black and white clothing in exhibit 9.3, neither of which are present in exhibits 9.5 or 9.6, as circumstantial evidence that the phots were taken on at least three different occasions.

The district court overruled Bracero-Navas's objection, finding "confident[ly]" and "unequivocally [that] the photos in 9.1, 9.3, and 9.6 were taken at different times . . . based on a close viewing of what's [i]n the photos, the different patterns of clothes all over the bathroom." The district court adopted the PSI's guidelines calculation. Bracero-Navas objected once more to "the clothing and pattern issue." Over that objection, the district court sentenced Bracero-Navas to 480 months' imprisonment with 15 years' supervised release. This is Bracero-Navas's appeal.

## DISCUSSION

Bracero-Navas asks us to vacate his convictions and sentence because the district court erroneously instructed the jury on the definition of lascivious exhibition and improperly relied on the guidelines commentary to decline grouping all his counts together. He contends that if his counts had all been grouped together, his

total offense level would be 39 and his guidelines range would have been 262 to 365 months.  We address each argument in turn.

*Jury Instruction*

Bracero-Navas argues that the district court "should have sustained [his] objection to the jury instruction" that "[d]epictions of otherwise innocent conduct may constitute a lascivious exhibition of the genitals or pubic area of a minor based on the actions of the individual creating the depiction."

We review de novo the legal accuracy of jury instructions. *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000).  District courts generally have broad discretion to formulate a jury charge, so long as it "accurately reflects the law and the facts."  *Id.* (citation omitted).  We will not reverse a conviction based on a jury charge unless it (1) inaccurately stated the law or substantially misled the jury, *id.*, and (2) we are "left with a substantial and eradicable doubt as to whether the jury was properly guided in its deliberations," *United States v. Puche*, 350 F.3d 1137, 1148 (11th Cir. 2003) (cleaned up).

The district court did not err in giving the lascivious exhibition jury instruction because it was an accurate statement of the law.  We said in *United States v. Holmes* that "depictions of otherwise innocent conduct may in fact constitute a 'lascivious exhibition of the genitals or pubic area' of a minor based on the actions of the individual creating the depiction."  814 F.3d 1246, 1251–52 (11th Cir. 2016).  This is the same statement of law that the district court gave the jury.  Bracero-Navas argues that we should abandon

*Holmes* and hold that "depictions of otherwise innocent conduct cannot constitute lascivious exhibition simply based on the actions or intent of the producer," like the D.C. and Eighth Circuits in *United States v. Hillie*, 39 F.4th 674, 685 (D.C. Cir. 2022), and *United States v. McCoy*, 55 F.4th 658, 661 (8th Cir. 2022), *vacated & reh'g granted*, No. 21-3895, 2023 WL 2440852 (8th Cir. Mar. 10, 2023). But, as Bracero-Navas himself acknowledges, our precedent forecloses his argument.[1] We affirm the convictions.

### Grouping of Counts

Bracero-Navas next argues that the district court relied on the guidelines commentary in declining to group all his counts into one group, which was improper under *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) (en banc).

Generally, we review de novo "the district court's decisions regarding grouping" and "its findings of fact only for clear error." *United States v. Nagel*, 835 F.3d 1371, 1374 (11th Cir. 2016) (citation omitted). However, if a defendant does not raise the relevant objection at the time of sentencing, we review the grouping decision for plain error instead of de novo. *United States v. Vandergrift*, 754 F.3d 1303, 1307 (11th Cir. 2014).

---

[1] "'The prior-panel-precedent rule requires subsequent panels of the court to follow the precedent of the first panel to address the relevant issue, 'unless or until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court.'" *Scott v. United States*, 890 F.3d 1239, 1257 (11th Cir. 2018) (citation omitted).

We review for plain error because Bracero-Navas failed to preserve his objection.  To preserve an issue for appeal, a defendant must properly raise it in the district court by "clearly stat[ing] the grounds for [his] objection." *United States v. Zinn*, 321 F.3d 1084, 1087 (11th Cir. 2003); *see also United States v. Massey*, 443 F.3d 814, 819 (11th Cir. 2006) (an objection must clearly inform the district court of its legal basis).  "The objection must be raised 'in such clear and simple language that the trial court may not misunderstand it.'" *United States v. Straub*, 508 F.3d 1003, 1011 (11th Cir. 2007) (quoting *Massey*, 443 F.3d at 819).  "[A] general objection or an objection on other grounds will not suffice." *United States v. Dennis*, 786 F.2d 1029, 1042 (11th Cir.), *on reh'g*, 804 F.2d 1208 (11th Cir. 1986).  A "defendant also fails to preserve a legal issue for appeal if the factual predicates of an objection are included in the sentencing record, but were presented to the district court under a different legal theory." *Massey*, 443 F.3d at 819 (citation omitted).

Bracero-Navas argues on appeal that "[t]he district court should have grouped [his] offenses together in a single group under [section] 3D1.2(b)" because "[t]he Supreme Court's decision in *Kisor* [*v. Wilkie*, 139 S. Ct. 2400 (2019),] and this Court's en banc decision in *Dupree* prohibit courts from deferring to a [g]uideline's commentary unless the [g]uideline is genuinely ambiguous."  Bracero-Navas never made this argument in the district court; he claims for the first time on appeal that section 3D1.2(b) "unambiguously required the district court to place all [his] counts in one group."

Instead, Bracero-Navas objected to his guideline computation in the district court based solely on a dispute of the underlying facts. He argued all his counts should be grouped into a single group of closely related counts under section 3D1.2 because "there is no evidence to determine when, where, or even how the images [of J.B.] were taken." He asserted that "[t]here is zero evidence that these images were created on different dates." This was an objection to the sufficiency of evidence that the photos of J.B. were taken on at least three different occasions. Thus, the district court was not clearly informed of the legal basis for Bracero-Navas's objection. *See Massey*, 443 F.3d at 819.

Bracero-Navas's argument fails under plain error review because he cannot show that any error was plain. For an error to be plain, it must be obvious and clear under current law. *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013) (citation omitted). "[A]n error cannot be plain unless the issue has been specifically and directly resolved by on point precedent from the Supreme Court or this Court." *United States v. Verdeza*, 69 F.4th 780, 794 (11th Cir. 2023) (cleaned up). No such error exists here. Neither the Supreme Court nor we have "specifically and directly resolve[d] the question of whether" section 3D1.2(b) is unambiguous and requires grouping under these circumstances. *Id.* (cleaned up).

## CONCLUSION

The district court did not err by denying Bracero-Navas's objections to its jury instruction or in its grouping decision under section 3D1.2(b).  We affirm.

**AFFIRMED.**

11/6/25, 1:23 AM    Incarceration up by 48% in Fixed Costs, US.com News E



Play Live Radio

LISTEN LIVE

MY PLAYLIST

                                                    DONATE

**Shots**

POLICY-ISH

## When a prison sentence becomes a death sentence

APRIL 27, 2023 · 5:01 AM ET                                    FROM **KFF** Health News

By Fred Clasen-Kelly



Larry Jordan, 74, served 38 years in an Alabama prison and is in poor health now. One reason the U.S. trails other developed countries in life expectancy, experts say, is that it has more people behind bars and keeps them there far longer.

*Charity Rachelle/KFF Health News*

After spending 38 years in the Alabama prison system, one of the most violent and crowded in the nation, Larry Jordan feels lucky to live long enough to regain his freedom.

The decorated Vietnam War veteran had survived prostate cancer and hepatitis C behind bars when a judge granted him early release late last year.

"I never gave up hope," says Jordan, 74, who lives in Alabama. "I know a lot of people in prison who did."

At least 6,182 people died in state and federal prisons in 2020, a 46% jump from the previous year, according to data recently released by researchers from the UCLA Law Behind Bars Data Project.

---

**Sponsor Message**

---

"During the pandemic, a lot of prison sentences became death sentences," says Wanda Bertram, a spokesperson for the Prison Policy Initiative, a nonprofit that conducts research and data analysis on the criminal justice system.

Now, Jordan worries about his longevity. He struggles with pain in his legs and feet caused by a potentially life-threatening vascular blockage, and research suggests prison accelerates the aging process.

## 2 million Americans in jail or prison

Life expectancy fell in the United States in 2021 for the second year in a row, according to the Centers for Disease Control and Prevention. That decline is linked to the devastating effect of covid-19 and a spike in drug overdoses.

Some academic experts and activists say the trend also underscores the lasting health consequences of mass incarceration in a nation with roughly 2 million imprisoned or jailed people, one of the highest rates in the developed world.

A Senate report last year found the U.S. Department of Justice failed to identify more than 900 deaths in prisons and local jails in fiscal year 2021. The report said the DOJ's poor data collection and reporting undermined transparency and congressional oversight of deaths in custody.

Thousands of people like Jordan are released from prisons and jails every year with conditions such as cancer, heart disease, and infectious diseases they developed while incarcerated. The issue hits hard in Alabama, Louisiana, and other Southeastern states, which have some of the highest incarceration rates in the nation.

**Behind bars far longer**

A major reason the U.S. trails other developed countries in life expectancy is because it has more people behind bars and keeps them there far longer, says Chris Wildeman, a Duke University sociology professor who has researched the link between criminal justice and life expectancy.

"It's a health strain on the population," Wildeman says. "The worse the prison conditions, the more likely it is incarceration can be tied to excess mortality."

Mass incarceration has a ripple effect across society.

Incarcerated people may be more susceptible than the general population to infectious diseases such as covid and HIV that can spread to loved ones and other community members once they are released. The federal government has also failed to collect or release enough information about deaths in custody that could be used to identify disease patterns and prevent fatalities and illness inside and outside of institutions, researchers says.

Over a 40-year span starting in the 1980s, the number of people in the nation's prisons and jails more than quadrupled, fueled by tough-on-crime policies and the war on drugs.

Federal lawmakers and states such as Alabama have passed reforms in recent years amid bipartisan agreement that prison costs have grown too high and that some people could be released without posing a risk to public safety.

The changes have come too late and not gone far enough to curb the worst effects on health, some researchers and activists for reform say.

Still, no one has proven that incarceration alone shortens life expectancy. But research from the early 2000s did show the death rate for people leaving prison was 3.5 times higher than for the rest of the population in the first few years after release. Experts found deaths from drug use, violence, and lapses in access to health care were especially high in the first two weeks after release.

Another study found that currently or formerly incarcerated Black people suffered a 65% higher mortality rate than their non-Black peers. Black people also make up a disproportionately high percentage of state prison populations.

**"Operating in the dark"**

The enactment in 2000 of the Death in Custody Reporting Act, and its reauthorization in 2014, required the DOJ to collect information about deaths in state and local jails and prisons.

The information is supposed to include details on the time and location of a death, demographic data on the deceased, the agency involved, and the manner of death.

But a recent report from the Government Accountability Office found that 70% of the records the DOJ received were missing at least one required data point. Federal officials also lacked a plan to take corrective action against states that didn't meet reporting requirements, the GAO found.

The deficiency in data means the federal government can't definitively say how many people have died in prisons and jails since the covid-19 pandemic began, researchers say.

"Without data, we are operating in the dark," says Andrea Armstrong, a professor at the Loyola University New Orleans College of Law, who has testified before Congress on the issue.

Armstrong says federal and state officials need the data to identify institutions failing to provide proper health care, nutritious food, or other services that can save lives.

The DOJ did not make officials available for interviews to answer questions about the GAO report.

In a written statement, agency officials said they were working with law enforcement and state officials to overcome barriers to full and accurate reporting.

11/6/25, 1:23 PM
Case 6:24-cr-00282-CEM-LHP     Document 44-1   Filed 11/06/25   Page 37 of 39 PageID
154
When a Prison Sentence Becomes a Death Sentence : Shots - Health News : NPR

"The Justice Department recognizes the profound importance of reducing deaths
in custody," the statement said. "Complete and accurate data are essential for
drawing meaningful conclusions about factors that may contribute to unnecessary
or premature deaths, and promising practices and policies that can reduce the
number of deaths."

Department officials said the agency is committed to enhancing its
implementation of the Death in Custody Reporting Act and that it has ramped up
its efforts to improve the quality and quantity of data that it collects.

The DOJ has accused Alabama, where Jordan was incarcerated, of failing to
adequately protect incarcerated people from violence, sexual abuse, and
excessive force by prison staff, and of holding prisoners in unsanitary and unsafe
conditions.

**One of the longest sentences in Alabama history**



Larry Jordan, a Vietnam War veteran, survived prostate cancer, hepatitis C, and a potentially life-threatening vascular blockage while incarcerated in Alabama.
*Charity Rachelle/KFF Health News*

Jordan served 38 years of a 40-year sentence for reckless murder stemming from a car accident, which his lawyer argued in his petition for early release was one of the longest sentences in Alabama history for the crime. A jury had found him guilty of being drunk while driving a vehicle that crashed with another, killing a man. If he were convicted today instead, he would be eligible to receive a sentence as short as 13 years behind bars, because he has no prior felony history, wrote Alabama Circuit Judge Stephen Wallace, who reviewed Jordan's petition for early release.

With legal help from Redemption Earned, an Alabama nonprofit headed by a former state Supreme Court chief justice, Jordan petitioned the court for early release.

On Sept. 26, 2022, Wallace signed an order releasing Jordan from prison under a rule that allows Alabama courts to reconsider sentences.

A few months later, Jordan says, he had surgery to treat a vascular blockage that was reducing blood flow to his left leg and left foot. A picture shows a long surgical scar stretching from his thigh to near his ankle.

The Alabama Department of Corrections refused an interview request to answer
questions about conditions in the state's prisons.

Jordan says his vascular condition was excruciating. He said he did not receive
adequate treatment for it in prison: "You could see my foot dying."

*KFF Health News, formerly known as Kaiser Health News (KHN), is a national
newsroom that produces in-depth journalism about health issues and is one of the
core operating programs at KFF — the independent source for health policy
research, polling, and journalism.*

life expectancy    prisons    u.s. department of justice



### Get the latest on the science of healthy living

From doctors' advice to cutting-edge research, find what you need
to live better in the NPR Health newsletter.

| Email address | SUBSCRIBE |

See more subscription options

By subscribing, you acknowledge and agree to NPR's Terms of Use and Privacy Policy.
NPR may share your name and email address with your NPR station. See Details.

## More Stories From NPR